**Ronald J. BAKKER and Marlys A. Bakker, Plaintiffs and Appellees,**

v.

**Amy IRVINE, Defendant and Appellant.**

No. 18243.

Supreme Court of South Dakota.

Considered on Briefs on Nov. 30, 1993.

Decided June 29, 1994.

**42**

Gary J. Pashby and Gregg S. Greenfield and David A. Hill, Legal Intern of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, for plaintiffs and appellees.

Richard Dale, Sioux Falls, for defendant and appellant.

JOHNS, Circuit Judge.

This is an appeal by Amy Irvine, from an order of the Honorable Judith Meierhenry, Second Judicial Circuit Court, granting Ronald and Marlys Bakker's motion for a new trial on the issue of damages. We reverse.

### FACTS

On May 26, 1990 (Saturday of Memorial Day weekend), Amy Irvine was involved in a motor vehicle accident with Ronald and Marlys Bakker at an intersection in Sioux Falls, South Dakota. Marlys Bakker was sitting in the front seat, passenger side, of an automobile driven by her husband, Ronald. Their son was in the back seat. The Bakkers, who were heading north on Minnesota Avenue, had stopped for a red light at 37th and Minnesota Avenue. Approximately ten seconds had passed before Amy Irvine rear-ended them at an estimated speed of 30–35 mph. The force of the collision pushed the Bakkers' car through the intersection and loosened the front seat.

When the Bakker automobile came to a rest, Mr. Bakker got out and walked around it to assist his wife. Due to the pain she was experiencing, Mrs. Bakker instructed her husband not to touch her and to wait for the ambulance to arrive. Mrs. Bakker was taken to McKennan Hospital by ambulance where she was given muscle relaxers, pain pills and instructions to wear a cervical collar home.

She complained of soreness in her neck, shoulder, and head and felt numbness in her right arm. Although Mr. Bakker felt soreness in his back, neck, and right knee, he never asked to see a physician while at the hospital.

After the accident Mrs. Bakker first sought treatment from her family doctor, Dr. James Burgers, on Tuesday, May 29, 1990. She was given additional pain pills and muscle relaxers. Upon his advice, she missed the equivalent of a little over three weeks of work. She last saw him in July 1990 for this accident.

On Wednesday, May 30, 1990, she sought treatment from her chiropractor, Dr. David Allen at the Brandon Chiropractic Clinic. (She had been seeing him prior to the accident for low-grade inflammatory pain between her shoulders and headaches). At this time she complained of pain from her waist up through her neck, muscular pain, stiffness, swelling, and spasms. Dr. Allen diagnosed a hyperflexion/hyperextension injury and ligament damage due to the accident. He did an initial treatment of spinal adjustment.

She sought a majority of her chiropractic care from Dr. David Ward (a successor to Dr. Allen at the Brandon Chiropractic Clinic). He treated her about once every three weeks. He testified that she sustained a permanent impairment of fourteen percent (14%) to her cervical spine. He also testified that she would probably need chiropractic care for the rest of her life. His continued treatment consists of spinal adjustment, trigger point therapy and massage.

Mrs. Bakker went through three bouts of physical therapy. In June of 1990, she began physical therapy but discontinued it six weeks later. In late 1990, she began physical therapy for another six week period. In December 1991, she began physical therapy again for a final six weeks.

Six months after the accident, on November 29, 1990, Mrs. Bakker consulted Dr. Robert E. Van Demark, an orthopedic surgeon. His X-rays revealed an abnormality in the cervical spine indicating a loss of cervical lordosis. He also diagnosed tendinitis and a

separated right shoulder. He testified that the soft tissue and bone injury had healed but the resulting scar tissue will result in permanent stiffness and pain. He examined her five times total. Those office examinations occurred in the months of January 1991, December 1991, and June 1992. He gave her a seven percent (7%) impairment rating for her neck and fourteen percent (14%) impairment rating for her shoulder. He placed no restrictions on her employment or recreational activities.

While she does engage herself in low impact aerobics, Mrs. Bakker has not taken up her old pursuits of swimming, volleyball and bowling for fear that they may aggravate soreness in her right shoulder and neck. She also has her husband or children carry the groceries and do the laundry and vacuuming because they all involve lifting. She is employed at Citicorp Investment Services where she performs "desk work." Her employment has not been affected by her injuries except to the extent that she can no longer carry heavy mail trays.

Irvine hired as her medical examiner, Dr. Robert Suga, an orthopedic surgeon. He gave Mrs. Bakker an eleven percent (11%) impairment rating of the whole person based on the diminished cervical range of motion after conducting a physical and neurologic examination and history.

Mr. Bakker did not seek medical treatment until he received chiropractic treatment on Wednesday, May 30, 1990. Since then, he has been under the chiropractic care of Doctors Allen and Ward of the Brandon Chiropractic Clinic. He suffers from pain in his right shoulder and occasionally in his neck. His treatment consists of spinal adjustment, trigger point therapy and massage. As of trial, he was receiving treatment from Dr. Ward once every five weeks. Dr. Ward gave Mr. Bakker a permanent impairment rating of six percent (6%). He has never sought treatment from an orthopedic doctor.

Mr. Bakker is employed at IBP where he is in charge of the knife room supply area. He is able to meet all of the physical demands of his job other than he is no longer able to go on the line to test air knives because of the pain he encounters in his right shoulder. At home, his testimony was that when he plays softball, he no longer plays in the outfield because his shoulder is aggravated when he throws the ball back to the pitcher. Likewise, he does not play volleyball as aggressively as he used to.

In September 1992, Irvine's hired medical examiner, Dr. Suga, gave Mr. Bakker a higher impairment rating of seven percent (7%). His examination consisted of a physical exam and history. Three percent (3%) impairment concerned loss of cervical range of motion and another four percent (4%) for a soft tissue injury to the cervical spine. No restrictions were placed on his employment or recreational activities.

As of time of trial, Mrs. Bakker's out-of-pocket damages consisted of 128¼ hours lost from work at a pay rate of $5.53 per hour, for a total income loss of $710.36. Her other out-of-pocket damages were $5,189.22 in chiropractic expense. Her attorney sought, in his closing argument, a total of $134,469.22. The jury verdict was for $24,399.58.

Mr. Bakker's out-of-pocket damages consisted of chiropractic expenses amounting to $1,233.00 and personal property damage of $8,434.34. His attorney asked in closing argument for a total of $57,667.34. The jury verdict was for $12,517.34, which included the property damage.

Prior to the trial, Amy Irvine made an offer of judgment, pursuant to SDCL 15–6–68, to Marlys Bakker in the amount of $30,000.00 and to Ronald Bakker for $13,500.00. The jury returned an amount less than these offers.

A jury trial was conducted on December 1 and 2, 1992, in the Second Judicial Circuit Court, Minnehaha County, South Dakota. At the conclusion of Bakkers' case-in-chief, they moved for a directed verdict on the issue of liability which the trial court denied. After this, Irvine presented her case-in-chief, Bakkers presented rebuttal evidence and, then, Irvine admitted liability. Special verdict forms were submitted to the jury. The jury returned the following damage awards (which are compared with the categorical amounts and the total amounts sought by Bakkers' counsel in his closing argument):

| Ronald Bakker | Jury Award | Sought |
|---|---|---|
| Past Medical Expense | $ 1,233.00 | 1,233.00 |
| Future Medical Expense | 600.00 | 7,000.00 |
| Permanent Impairment | 1,000.00 | 10,000.00 |
| Past Pain and Suffering | 250.00 | 4,000.00 |
| Future Pain and Suffering | 1,000.00 | 17,500.00 |
| Past Loss of Enjoyment of Life | 0.00 | 2,000.00 |
| Future Loss of Enjoyment of Life | 0.00 | 5,000.00 |
| Past Loss of Spousal Services and Consortium | 0.00 | 1,000.00 |
| Future Loss of Spousal Services and Consortium | 0.00 | 1,500.00 |
| Property Damage and Other Damage | 8,434.34 | 8,434.34 |
| Total [1] | $12,517.34 | 57,667.34 |

| Marlys Bakker | Jury Award | Sought |
|---|---|---|
| Past Medical Expense | $ 5,189.22 | 5,189.22 |
| Future Medical Expense | 6,000.00 | 13,600.00 |
| Permanent Impairment | 5,000.00 | 25,000.00 |
| Past Pain and Suffering | 1,250.00 | 10,000.00 |
| Future Pain and Suffering | 2,500.00 | 60,000.00 |
| Loss of Earnings | 710.36 | 710.36 |
| Past Loss of Enjoyment of Life | 1,250.00 | 5,000.00 |
| Future Loss of Enjoyment of Life | 2,500.00 | 15,000.00 |
| Total [1] | $24,399.58 | 134,469.22 |

The Honorable Judith Meierhenry entered judgment on the verdicts on December 15, 1992 and notice of entry of judgment was provided by mail on that date.

Amy Irvine testified twice at the trial, first as an adverse witness of Bakkers and then during her own case-in-chief. As an adverse witness, she related events surrounding the accident, including that she had run into the Bakkers' vehicle when it was stopped for a red light. When she was recalled to the stand in her case-in-chief, she testified to her general background, such as age, employment and education. She testified that she was living with her mother and her mother's husband; that her parents were divorced; and that she attended Washington High School and was on the A and B honor rolls. She related that she had hopes of attending Brookings University in the fall. She testified that she worked at Howard Johnson gathering and washing laundry. She was permitted to testify, over objection, that her injuries consisted of bruised knees and that she never sought any medical attention for them. She stated her observations of Mr. and Mrs. Bakker at the scene of the accident, including that Mr. Bakker "seemed fine; seemed to walk like a normal person would." She also testified that she contacted Mrs. Bakker after the accident to see how she was doing.

After Irvine admitted liability, the Bakkers moved to strike her testimony claiming that "the only reason counsel did not admit liability prior to this point in time is the fact that he wanted to get his client on the stand and tell a tale of woe." The trial court denied this motion, ruling that portions of the testimony were relevant to the damage issue and that the jury would be instructed to not make their decision on passion or prejudice.

On December 16, 1992, the Bakkers made a motion for a new trial on the issue of damages pursuant to SDCL 15-6-59(a)(1), (a)(5) and (a)(6). The Bakkers argued that Irvine's testimony during her case-in-chief and her delayed admission of liability constituted an irregularity in the proceedings denying them a fair trial; that the damages awarded were so inadequate as to appear to have been given under the influence of passion or prejudice; and that the evidence was insufficient to justify the verdict.

1. If one adds up all of the individual damages claimed by Bakkers' counsel at closing argument, this sum total cannot be reconciled with the totals requested by him.

In her December 31, 1992, order granting a new trial on the issue of damages Judge Meierhenry held, in part, as follows:

> It further appearing to the satisfaction of the Court that the defendant's tactic of not admitting liability under the facts and circumstances of this case until after the young defendant testified as to her present employment, place and circumstances of living, and future college plans, was clearly designed for the purpose of swaying the jury with sympathy; and it further appearing to the satisfaction of the Court and Court so concludes that although the Court instructed the jury not to base its decision on sympathy or prejudice, that the jury award is so small with respect to each of plaintiffs that it must have been reached while under the influence of passion, prejudice, or gross mistake, or, that it was the result of accident or perverted judgment, and not of cool and impartial deliberation; and it further appearing the Court so concludes that based upon all of the evidence, the experts' impairment ratings, the offer of judgment, and the credibility of the plaintiffs, and having presided over several soft tissue injury cases in this circuit during the past four years, that it is shocking that the jury returned such a low damage award. . . .

## ISSUES

I. WHETHER IRVINE'S TESTIMONY IN HER CASE–IN–CHIEF AND HER LATTER ADMISSION OF LIABILITY CAUSED SUCH AN IRREGULARITY IN THE PROCEEDINGS THAT BAKKERS WERE PREVENTED FROM RECEIVING A FAIR TRIAL, THEREBY REQUIRING A NEW TRIAL.

II. WHETHER THE DAMAGES AWARDED TO BAKKERS BY THE JURY WERE SO INADEQUATE AS TO APPEAR TO HAVE BEEN GIVEN UNDER THE INFLUENCE OF PASSION OR PREJUDICE, THEREBY REQUIRING A NEW TRIAL.

III. WHETHER THE EVIDENCE IS INSUFFICIENT TO JUSTIFY THE JURY'S VERDICT, THEREBY REQUIRING A NEW TRIAL.

## ANALYSIS

Motions for new trial on questions of fact are addressed to the sound discretion of the trial court. The granting or denial of these motions will not be disturbed by this appellate tribunal unless and until it "appears affirmatively from the record that there has been an abuse of discretion." *Basin Elec. Power Coop. v. Gosch,* 90 S.D. 222, 226, 240 N.W.2d 96, 98 (1976). An abuse of discretion refers to a discretion exercised to an end or purpose not justified by and clearly against, reason and evidence. *Cody v. Edward D. Jones & Co.,* 502 N.W.2d 558 (S.D.1993); *Herndon v. Herndon,* 305 N.W.2d 917 (S.D. 1981). It occurs when no " 'judicial mind, in view of the law and the circumstances of the particular case, could reasonably have reached such a conclusion.' " *Dartt v. Berghorst,* 484 N.W.2d 891, 894 (S.D.1992) (quoting *Jensen v. Weyrens,* 474 N.W.2d 261, 263 (S.D.1991)) (quoting *Estate of Pejsa,* 459 N.W.2d 243, 245 (S.D.1990); *Estate of Smith,* 401 N.W.2d 736 (S.D.1987)).

■ In conducting our review we must keep in mind that "[o]rders granting new trials stand on firmer ground than orders denying them as they are not conclusive or decisive of any rights or issues. On the contrary they merely 'open the way for a reinvestigation of the . . . case upon its facts and merits.' " *Jensen v. Miller,* 80 S.D. 384, 124 N.W.2d 394, 396 (1963) (quoting *Pengilly v. J.I. Case Threshing Mach. Co.,* 11 N.D. 249, 91 N.W. 63 (1902)). In this connection, "this court views the evidence most favorable to the conclusions reached by the trial court . . . rather than most favorable to the verdict when a new trial is denied." *Id.* (citations omitted).

■ Grounds for a new trial have been codified at SDCL 15–6–59(a). Bakkers were granted a new trial under the following subsections:

> 15–6–59(a). **Grounds for a new trial.** A new trial may be granted to all or any of the parties and on all or part of the issues for any of the following causes:
>
> (1) Irregularity in the proceedings of the court, jury, or adverse party or any or-

der of the court or abuse of discretion by which either party was prevented from having a fair trial;

. . . . .

(5) Excessive or inadequate damages appearing to have been under the influence of passion or prejudice;

(6) Insufficiency of the evidence to justify the verdict or other decision or that it is against law;

The first issue to be decided is whether the trial court properly allowed a new trial for the reason that there was an irregularity in the trial which prevented the Bakkers from receiving a fair trial. The expression " 'irregularity in the proceedings' [ . . . while not susceptible to any exact definition,] relates generally to departures by the court, during the trial of a case, from the due and orderly method of disposition of a case...." 58 Am.Jur.2d *New Trial* § 96 (1989). In South Dakota this concept includes misconduct on the part of the court (*State v. Eloe,* 59 S.D. 440, 240 N.W. 486 (1932)), the attorneys (*Voegeli v. Schultz,* 67 S.D. 538, 295 N.W. 493 (1940)), and the parties (*Poe v. Arch,* 26 S.D. 291, 128 N.W. 166 (1910)). Bakkers argued to the trial court and the court found that counsel for Irvine intentionally declined to admit liability at the close of Bakkers' case-in-chief so that he could call Irvine to the witness stand and have her testify to matters which were designed to elicit sympathy from the jury.[2] The nub of their argument is that Irvine's delayed admission of liability denied them of the opportunity to timely object to the relevancy of Irvine's testimony. They, in effect, claim that Irvine's counsel sandbagged them and that this trial tactic is misconduct. Since we are of the opinion that Bakkers did have an ample opportunity to timely object to the questioned testimony and cannot now complain that the same was improperly admitted, we need not address the question of whether defense counsel was guilty of misconduct. We will note, however, that Bakkers have failed to submit any legal authority that Irvine had a duty to concede that she was negligent.

▮▮▮▮  It is elementary that "evidence, received without objection, is available to the trier of fact...." *Killian v. Hubbard,* 69 S.D. 289, 295, 9 N.W.2d 700, 703 (1943).

If when inadmissible evidence is offered the party against whom such evidence is offered consents to its introduction, or fails to object, or to insist upon a ruling on an objection to the introduction of such evidence, and otherwise fails to raise the question as to its admissibility, he is considered to have waived whatever objection he may have had thereto, and the evidence

---

**2.** Bakker's motion for a new trial was predicated on Amy Irvine's background testimony she gave when her attorney put her on the stand. The following dialogue took place between Amy Irvine and her counsel.

Q: (By attorney Dale) Please, state your name.
A: Amy Irvine.
Q: And, Amy, where do you live?
A: 517 North Omaha, Sioux Falls, South Dakota.
Q: And do you live alone?
A: No, I live with my mother and her husband.
Q: All right. And is her husband your dad?
A: Not my real dad, no.
Q: Are your parents divorced?
A: Yes, they are.
Q: And how old are you?
A: I'm 19.
Q: And what is your date of birth?
A: February 23, 1973.
Q: And have you lived basically in this area all your life?

A: Basically.
Q: And, Amy, if you could give us your educational background.
A: Well, I attended Washington High School. I was on the A and B Honor Roll; graduated. I'm now looking forward to a college education.
Q: Okay. Do you have college plans?
A: Yes, I do.
Q: All right. And what do they include?
A: Hopefully I'm hoping to go to Brookings University, perhaps for an autonomy [sic] degree.
Q: And have you got a certain date you are going to enroll there?
A: Next fall.
Q: And are you currently employed?
A: Yes, I am.
Q: And where are you employed?
A: At Howard Johnson.
Q: Okay. What do you do there?
A: Basically I just go out in the halls and gather laundry from the maids and take it to the laundry room. I wash it, dry it and fold it and put it away.

is in the record for consideration the same as other evidence.

*In re Interest of E.G.*, 240 Neb. 373, 380, 482 N.W.2d 17, 22 (1992) (citations omitted); *See also* 75 Am.Jur.2d *Trial* § 412 (1991). A proper objection to exclude offered evidence or a motion to strike evidence already in the record must be made in a timely fashion and must state the appropriate ground(s) therefore.[3] An objection is not considered timely unless it is made as soon as the party objecting knows or reasonably should have known that the evidence is objectionable.

In order to preserve the right to have a question reviewed, a party feeling aggrieved by any incident in the progress of a trial must make his objection known at the earliest opportunity, when the occasion therefor arises, or as soon as the potential objector has the opportunity to learn that the evidence is objectionable, unless there is some specific reason for a postponement.

75 Am.Jur.2d *Trial* § 401 (1991). The reason for this rule is to give the trial court the opportunity to take appropriate preventive or corrective action.

We agree with the trial court that the testimony concerning Irvine's present employment, place and circumstances of living, and her future college plans is not relevant to any issues in this case. This evidence simply does not shed any light on the questions of whether she was negligent, whether her negligence was the proximate cause of any of the Bakkers' claimed injuries, or the extent of their claimed damages. Nor is this testimony relevant to the witness' competency to testify (*i.e.*, her abilities to observe, remember, and communicate).[4] However, the fact that this evidence was irrelevant does not change the fact that the Bakkers did not object to this testimony at the time it was

given; nor did they move to strike the same at the conclusion of Irvine's testimony or at the conclusion of Irvine's case-in-chief. Nor does the fact that Bakkers' counsel was under the misconception that this testimony would be relevant to the issue of whether Irvine was negligent, constitute a valid excuse for the late motion to strike Irvine's testimony. We conclude, as a matter of law, that Bakkers failed to timely object to the evidence and that, thus, they cannot be heard to now complain that its admission constitutes an irregularity in the proceeding.

The second and third issues may be combined for analysis. The second issue is whether the damage verdicts were so inadequate so as to appear to have been given under the influence of pity or sympathy for Irvine so as to require a new trial under SDCL 15-6-59(a)(5). The third issue is whether the damage verdicts are so inadequate such that they are manifestly against the great weight of the evidence thereby justifying a new trial under SDCL 15-6-59(a)(6). Albeit the Bakkers' complaint under either ground is the adequacy of the verdicts,

[t]he two grounds complement each other and urging one does not operate to exclude the other. It is true if a verdict is found excessive [or inadequate] and determined to have been given under the influence of passion and prejudice, it would follow that the evidence does not sustain it. However, a determination that a verdict was not rendered under the influence of passion and prejudice does not foreclose a party from asserting that it is not supported by the evidence.

*Plank v. Heirigs*, 83 S.D. 173, 186–87, 156 N.W.2d 193, 201 (1968) (citations omitted). Having said that we recognize that the two

---

3. SDCL 19-9-3(1) provides:

Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and (1) In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context. . . .

SDCL 19-9-3(1) (1987).

4. By this decision we do not mean to imply that all background questions are inadmissible. It is a basic practice of the bar of this state and throughout this country to have all types of witnesses testify to their backgrounds. "[B]ackground questions should be asked of all witnesses because credibility is always an issue." Mauet, *Fundamentals of Trial Techniques* 76 (3d ed. 1992). "The jurors want to know a little bit about the witness so that they have an initial basis for assessing credibility." *Id.* at 75.

grounds are not necessarily mutually exclusive, we will combine the two in the following discussion since we are of the opinion that the trial court erred when it concluded that the damages were "inadequate." ..

As we have already stated, our review of the trial court's actions are under the abuse of discretion of standard. Whether the decision of a trial court constitutes an abuse of discretion will depend on the facts of a particular case and the standard that the trial judge was required to apply to a given set of facts.

■ When, in a tort action involving personal injuries, a motion for a new trial is based on the claim that the damages are either excessive or inadequate, it must be remembered that the amount of damages to be awarded "is peculiarly a question for the jury." *Stoltz v. Stonecypher,* 336 N.W.2d 654, 657 (S.D.1983); *See Freeman v. Berg,* 482 N.W.2d 32 (1992); *Itzen v. Wilsey,* 440 N.W.2d 312 (S.D.1989). There are several reasons for this rule including the fact that a defendant may claim that a plaintiff's claimed damages are neither reasonable in amount nor proximately caused by the defendant's negligence. There are also, oftentimes, claims that a plaintiff was contributorily negligent or failed to mitigate his damages. *Itzen, supra; Gould v. Mans,* 82 S.D. 574, 152 N.W.2d 92 (1967). In addition and as happened in this case, Bakkers claimed damages for pain and suffering, loss of enjoyment of life, loss of consortium, and physical disability. These damages are unique since they do not compensate a plaintiff for a known monetary loss which has been experienced or is likely to be experienced. Thus, there is no way to quantifiably measure the amount that a trier of fact should award in dollars. *Nelson v. Rahman,* 219 N.W.2d 474, 476 (S.D. 1974).

Given the deference we have held should be accorded to jury damage verdicts in personal injury actions, we have repeatedly stated that a new trial cannot be granted merely because the verdict reflects either a liberal or conservative attitude or because it is larger or smaller than a court believes it should be.[5] *See, e.g., Freeman, supra; Kusser v. Feller,* 453 N.W.2d 619 (S.D.1990); *Itzen, supra; Stoltz, supra; Weidner v. Lineback,* 82 S.D. 8, 140 N.W.2d 597 (1966). This philosophy is carried over to our test of whether damages are excessive or inadequate under subsection five (5) because they "[appear] to have been given under the influence of passion or prejudice." The jury's damage award cannot be overturned unless it "is so extremely excessive [or inadequate] as to justify the inference or conclusion that it is the product of corruption, passion or prejudice." *Neb. Elec. Generation & Trans. Co-op. v. Tinant,* 90 S.D. 284, 292, 241 N.W.2d 134, 138 (1976) (citing *Tufty v. Sioux Transit Co.* 70 S.D. 352, 17 N.W.2d 700 (1945); *Ross v. Foss,* 77 S.D. 358, 92 N.W.2d 147 (1958)). Or, as we have otherwise said, "[t]he damages, therefore, must be so excessive [or inadequate] as to strike mankind, at first blush, as being, beyond all measure, unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice or corruption." *Klug v. Keller Industries, Inc.,* 328 N.W.2d 847, 851 (S.D. 1982) (quoting *Schuler v. City of Mobridge,* 44 S.D. 488, 493, 184 N.W. 281, 283 (1921)); *See also Weidner, supra.*

The third issue is whether the damages awarded by the jury are justified by the evidence. In *Lewis v. Storms,* 290 N.W.2d 494 (S.D.1980), we recognized that "[i]t is not an abuse of discretion for the trial court to set aside a verdict if, in the opinion of the

---

5. We stated in *Klaveness v. Freese,* 33 S.D. 263, 274, 145 N.W. 561, 565–66 (1914), the following:

   And a verdict in an action to recover damages capable of ascertainment by some standard of measurement, but which awards an amount not only not commensurate with, but glaringly disproportioned to, that justified by the evidence, is invalid. But where there is no such standard of measurement and the damages are unliquidated and the amount to be awarded is discretionary with the jury, a verdict cannot be deemed objectionable for inadequacy merely because, in the opinion of the court, more might have been awarded, but the verdict must be so small as to indicate that the jury must have found it while under the influence of passion, prejudice, or gross mistake, or, in other words, that it is the result of accident or perverted judgment, and not of cool and impartial deliberation.

   *Id.*

court, the conclusion reached is unreasonable and demonstrates that the jury 'failed to fairly exercise the reasoning faculty on the facts before them.'" *Id.* at 497 (quoting *Drew v. Lawrence,* 37 S.D. 620, 627, 159 N.W. 274, 277 (1916)). While we recognized that the trial court must exercise its discretion when presented with a motion for a new trial, we did not mean to imply that a court has carte blanche discretion to differ with the actions of a jury. Rather, neither the trial court nor this court may set aside a verdict unless it is clearly "unreasonable, arbitrary and unsupported by the evidence." *Kusser v. Feller,* 453 N.W.2d at 621 (citing *Lewis, supra*). Since the very early days of this state, great deference has been accorded to jury verdicts when an argument is made that they are not supported by the evidence. In *Drew, supra,* we said:

> In considering the verdict of a jury in any particular case, to determine whether or not it is sustained by the evidence, we are not to speculate or query how we would have viewed the evidence and testimony, or what verdict we would have rendered had we been of the jury. The real and only question to be solved and answered is, *Is there any legal evidence upon which the verdict can properly be based, and the conclusions embraced in and covered by it be fairly reached?* It is the province of the jury to weigh and pass upon the evidence; to reconcile conflicting testimony; to determine the truth or value of evidence; to ascertain and declare, from all the evidence and testimony, the facts of the case; and from the facts, when ascertained by them, and the law as given to them by the court, to arrive at and announce their decision, which is their verdict. And we cannot determine what specific evidence they relied upon in reaching that verdict; nor how they reconciled or adjusted conflicting evidence or testimony; nor just what they rejected or doubted; nor the precise weight or effect they gave to any particular ... item of evidence or testimony.... This court will, as a general rule, only ask and determine, Is there any legal evidence or testimony which fairly warrants the verdict of the jury? If there is, particularly in a case where the

evidence is conflicting, the verdict will not be disturbed; and, if there is not, the verdict will be set aside.

*Drew,* 37 S.D. at 624, 159 N.W. at 275 (citing *Weiss v. Evans,* 13 S.D. 185, 82 N.W. 388 (1900); *Jeansch v. Lewis,* 1 S.D. 609, 48 N.W. 128 (1891); *Franz Falk Brewing Co. v. Mielenz,* 5 Dak. 136, 37 N.W. 728 (1888)) (emphasis added).

■ We have reviewed the entire record in a light most favorable to the conclusions reached by the trial court. Having done so, we are convinced that the trial court abused its discretion when it determined that the damages were inadequate. Of the economic damages readily capable of being measured in dollars and cents, the Bakkers received exactly what they proved and what they sought. They each received the exact amount of their medical expenses to date of trial; Ronald Bakker received the exact amount of his claimed property damages; and Marlys Bakker received the exact amount of her lost earnings.

Of far less certainty than the economic damages already suffered, are the economic damages that a person may suffer in the future. While Ronald Bakker received only a minimal award for his claimed future chiropractic expenses, Marlys Bakker received approximately one-half of her's. We must note, however, that the jury was not presented with any evidence whereby future chiropractic expenses were reduced to present value and that, further, the judgment did not reduce the amounts awarded to present value.

Finally, of the non-economic damages, the value of which are necessarily subject to the subjective consensus of the jury, Ronald Bakker received $1,000.00 or one-tenth of what he claimed for his permanent disability and Marlys Bakker received $6,000.00 or one-fifth of what she claimed. As to past and future pain and suffering/loss of enjoyment of life, Ronald received $1,250.00 of the $28,500.00 claimed and Marlys received $6,500.00 of the $90,000.00 claimed. Ronald also made a total claim of $2,500.00 for past and future loss of spousal services and consortium for which the jury did not award him anything. In respect to the loss of spousal service, he complained that since the accident he had helped with certain household chores such as

**50**

vacuuming. There was no evidence, however, as to what the cost of replacement would be. As to the loss of consortium, there was evidence that the parties were not as intimate as usual for the first three or four weeks following the accident. There was some disagreement between Mr. and Mrs. Bakker whether, as of time of trial, they were as intimate as they always had been.

Of the total damages sought by Ronald Bakker of $57,667.34, some $41,000.00 constituted non-economic damages. Of the total sought by Marlys Bakker of $134,469.22, some $115,000.00 constituted non-economic damages.

Accepting the fact that both Bakker's are permanently and partially disabled (Mrs. Bakker to a far greater extent that Mr. Bakker); and accepting the fact that both Bakkers will most likely experience physical pain as the result of their disabilities for the rest of their lives (again Mrs. Bakker to a far greater extent than Mr. Bakker); and having considered the nature, intensity, and extent of the Bakkers' physical pain and disabilities as shown by their evidence; and accepting the fact that the quality of their lives is affected by the physical pain they suffer and by their disabilities; we are of the opinion that the non-economic damages as well as the other damages awarded by the jury are not facially or manifestly inadequate. While the jury's awards for these damages may have been affected somewhat by the Irvine's personal background evidence, there are no objective factors by which this supposition can be measured. Instead, the evidence supports the actions of the jury.

We hold that the trial judge abused her discretion when she granted the Bakkers a new trial under SDCL 15–6–59(a)(1), (5), and (6). Accordingly we reverse the order granting a new trial and reinstate the judgment as previously entered.

MILLER, C.J., and HENDERSON, SABERS and AMUNDSON, JJ., concur.

JOHNS, Circuit Judge, for WUEST, J., disqualified.